Filed 7/25/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

<table>
<tr><td>

MASONITE CORPORATION,

    Petitioner and Appellant,

v.

COUNTY OF MENDOCINO et al.,

    Defendants and Respondents;

GRANITE CONSTRUCTION
COMPANY,

    Real Party in Interest and
    Respondent.

</td><td>

A134896

(Mendocino County Super. Ct.
No. SCUK CVPT 1056883)

</td></tr>
</table>

Masonite Corporation (Masonite) appeals from a judgment denying its petition for writ of mandate to set aside approvals by Mendocino County (County) of the Kunzler Terrace Mine Project (Project) to be developed by Granite Construction Company (Granite; Granite and the County are hereafter referred to collectively as respondents), and the final environmental impact report (EIR) for its Project, for failure to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

Masonite argues the approval process and the EIR were deficient in several ways. The County was required to recirculate the EIR because the Project as approved had significantly greater impacts than the one originally proposed. Recirculation was also required because the EIR disclosed a new significant impact on the Foothill Yellow-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.D., II.E., and II.F.

1

Tailed Frog (Frog) that was not adequately mitigated. The County erroneously determined that conservation easements and in-lieu fees were not feasible ways to mitigate the loss of prime farmland due to the Project. The EIR did not adequately analyze the Project's cumulative impacts on agricultural resources. The County failed to adopt adequate measures to mitigate significant impacts from truck traffic along a private road associated with the Project. And finally, that the EIR failed to adequately evaluate Project alternatives.

We agree with Masonite's contentions involving: recirculation for comment on possible mitigation measures that can protect the Frog; the infeasibility of agricultural conservation easements and in-lieu fees; discussion of cumulative impacts on farmland; and mitigation measures for truck traffic. Accordingly, we reverse the judgment denying the petition for writ of mandate, with directions that the County set aside its certification of the EIR, and prepare and circulate a supplemental EIR that addresses the errors we identify.

## I. BACKGROUND

The Project is a sand and gravel quarry to be developed on 65.3 acres approximately one mile north of Ukiah. The site is bordered on the north by Ackerman Creek, on the east by the Russian River, on the south by property owned by Masonite, and on the west by Kunzler Ranch Road. Most of the site is cultivated as a vineyard, with an open space portion in the northeast and a truck maintenance shop at the northwest corner. Forty-five acres of the site's 65 acres are classified as "prime farmland," but the site has been zoned for industrial use since 1982. It is surrounded by a lumber mill to the north of Ackerman Creek, agricultural land to the east of the Russian River, Masonite's industrial property to the south (described as "vacant" on area maps), and industrial and commercial properties to the west.

Granite plans to extract 3.37 million tons of aggregate from 30.3 acres of the site over a 25-year period. The mine is designed to operate year-round, six days a week, 14

2

hours a day.[1] The mining will be done in phases to allow for concurrent site reclamation, and five years of reclamation are planned after the mining operations are complete. Following reclamation, the northwestern portion of the property will be available for future industrial uses, and the rest of the site will be "open space (ponds)."

Granite submitted an application to the County for approval of a conditional use permit and reclamation plan for the Project in February 2008. The County determined that an environmental impact report was required, solicited comments from government agencies in April 2008, and noticed preparation of a draft environmental impact report (Draft) in October. The Draft was released for public and agency review in September 2009. Among those who commented critically on the Draft and the Project were SCS Engineers on behalf of Masonite, and Russian Riverkeeper, an organization dedicated to protection of the Russian River environment.

The EIR was released for review on May 3, 2010. The EIR identified two significant and unavoidable Project impacts, the permanent loss of prime farmland, and traffic problems that would develop by the year 2030. The EIR came before the County Planning Commission on May 20, 2010. After considering public comments, including those on behalf of Masonite, the Planning Commission certified the EIR and approved the use permit and reclamation plan. The Planning Commission adopted a statement of overriding considerations noting, among other things, that the Project would provide "a reliable 20-year supply of construction aggregate in the Mendocino County area."

Masonite and Russian Riverkeeper appealed the planning commission decisions to the County Board of Supervisors. The appeals were heard by the board on July 27, 2010. The day of the hearing, Masonite filed a 49-page letter brief challenging the EIR on approximately 20 grounds. The board denied both appeals.

Masonite and Russian Riverkeeper filed petitions for writ of mandate seeking to overturn the County's approval of the Project due to violations of CEQA. The petitions

---

[1] Granite advised at the County board of supervisors hearing on the Project that, in response to comments from the Regional Water Board, it agreed to suspend mining during the wet season between November and March.

were denied, and Masonite and Russian Riverkeeper appealed from the judgments. Russian Riverkeeper's appeal was dismissed after settlement.

## II.  DISCUSSION

### A.  Scope of Review

"In reviewing an agency's compliance with CEQA . . . the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.'  [Citation.]  Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'  [Citations.]

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.  [Citations.]  We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the County and whether it contains substantial evidence to support the County's factual determinations."  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427, fn. omitted (*Vineyard*).)

### B.  Recirculation of the EIR

(1)  *Arguments and Standards*

Masonite contends that the EIR should have been recirculated for public review because the Project as approved was "different markedly" from the one analyzed in the Draft and had more severe environmental impacts, and because the EIR identified a new significant impact on the Frog .

"A lead agency is required to recirculate an EIR when significant new information is added to the EIR after public notice is given of the availability of the draft EIR for public review . . . but before certification."  (Cal. Code Regs., tit. 14, § 15088.5, subd. (a) [the CEQA Guidelines in Cal. Code Regs., tit. 14, § 15000, et seq. are hereafter cited as Guidelines]; Pub. Resources Code, § 21092.1.)  "[T]he addition of new information to an EIR after the close of the public comment period is not 'significant' unless the EIR is

4

changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1129 (*Laurel Heights II*); see also *Vineyard*, *supra*, 40 Cal.4th at p. 447, quoting *Laurel Heights II*.) "Significant new information" includes a disclosure showing that "[a] new significant environmental impact would result from the project . . . ." (Guidelines, § 15088.5, subd. (a)(1).)

(2) *Project Alterations*

The Project was changed in two respects from the one originally envisioned.

(a) Pond-River Connection in Lieu of a Weir and Fuse Plug

Granite's application for the use permit and reclamation plan recognized that, "because of its proximity to the Russian River and Ackerman Creek, the project site has valuable aquatic and riparian habitats adjacent to it. The aquatic habitat supports Chinook salmon and steelhead, both listed as threatened species under the Endangered Species Act. The primary concern for these species relative to the proposed project is the potential for fish entrapment in the pit during floods high enough to inundate the site." The application noted with respect to hydrology and drainage that, "as an alluvial terrace adjacent to the Russian River and Ackerman Creek," the Project site "is subject to periodic inundation. . . . Extensive hydrologic modeling was conducted to design an overflow structure that would minimize the potential for fish to become entrapped in the pit, and prevent erosion of pit banks and walls during a 100-year flood event."

Granite's application proposed to address the potential for flooding and trapped fish with construction of a flood control weir and fuse plug. "The armored overflow weir gives the creek and river a controlled access and drainage point for flood waters without eroding the mining buffer, while the erodable [*sic*] fuse plug limits potential fish entrapment." In May 2008, comments on the Project, the National Marine Fisheries Service (NMFS) of the National Oceanic and Atmospheric Administration stated that "reconnecting the pit to the stream" would provide better long-term protection for endangered salmonids than the proposed weir and fuse plug. Granite's study of the

NMFS proposal, attached as Appendix F to the Draft, concluded that it would be preferable to use a connection channel between the mine pond and the Russian River in lieu of the weir and fuse plug.

The Project as proposed in the Draft provided for use of the weir and fuse plug, but the pond-river connection channel design was presented as "Alternative 3"  It replaced the weir and fuse plug with "a culvert (or culverts) suitable for the project life (rather than as a permanent structure as under the proposed project)," and eliminated the need for ongoing maintenance of the weir and fuse plug.  The Draft determined that "stranding or entrapment of special-status salmonids" would be a potentially significant impact if the Project were constructed with the weir and fuse plug.  However, mitigation measures that included salmonid rescue and relocation programs implemented in consultation with NMFS and the Department of Fish and Game (Fish & Game), would make this impact "[l]ess than significant."  The Draft further stated that if Alternative 3 was implemented, it would "reduce[] the potential significance of pit capture and salmonid entrapment" and "eliminate the need for the rescue plan."

In November 4, 2009, comments on the Draft, NMFS expressed concern that when pit mining operations resulted in ponds of standing groundwater more than 35 feet deep, anaerobic conditions would threaten the vitality of any salmonids trapped in the ponds, and the depths of the reclaimed ponds would need to be regulated to achieve suitable habitat.

The County determined in the EIR that Alternative 3 was "environmentally superior" to the weir and fuse plug, and the NMFS supported Alternative 3 in comments submitted prior to Planning Commission approval of the EIR.  As approved, the Project included the pond-river connection in lieu of the weir and fuse plug reflected in the revised reclamation plan appended to the EIR.

Although the Draft stated that the pond-river connection would eliminate the need for a salmonid rescue program, the EIR retained a rescue program during the mining phase of the Project.  The Draft set forth two options for the reclamation phase.  Option A provided for construction of the pond-river connection unless NMFS and

6

Fish & Game staff determined that the "potential adverse water quality within the pit" would outweigh the connection's expected benefits to salmonid habitat. Option B required Granite to continue the salmonid rescue program until NMFS and Fish & Game said it was no longer needed.[2] In the EIR, Option B was unchanged, and Option A was amended to provide simply for construction of the pond-river connection. The deference to NMFS and Fish & Game concerns over water quality in the pit was replaced in the EIR by more detailed mitigation requirements, set forth in new mitigation measure 3.4.4-ALT 3, to address concerns raised in NMFS's November 2009 letter. Specifically, the EIR stated that Granite would limit the depth in the reclaimed ponds to 35 feet as NMFS stated would be acceptable, or deeper if acceptable pursuant to a future water quality assessment.[3]

(b) Floodplain Benching

The term "floodplain benching" refers to a proposal by Granite in the Project application, to widen the Ackerman Creek and Russian River channels "to improve channel hydraulic capacity and winter rearing habitat for salmonids above what is currently available which, in turn, will increase annual winter juvenile salmonid survivability in the project vicinity." This "floodplain benching" was incorporated into the Draft, along with mitigation measures for its impact on salmonids and riparian habitat.

---

[2] The Draft stated: "Measure 3.4.4: [¶] . . . [¶] Reclamation Phase [¶] Option A. Prior to completion of reclamation, Granite shall, in coordination with NMFS and [Fish & Game], evaluate the results of the biological feasibility, and design and construct an alternative reclamation design consistent with the extended hydrologic connection concept discussed above during the 5-year reclamation phase (see also Chapter 4, Project Alternatives). If, during coordination with NMFS and [Fish & Game], regulatory agency staff determine that the potential adverse water quality effects within the pit would outweigh the expected benefits to salmonid habitat, Granite shall not implement this mitigation measure. [¶] Option B. Granite shall maintain a salmonid rescue and relocation program in consultation with NMFS and [Fish & Game] until it is determined by those agencies that such a program is no longer necessary."

[3] Mining to a greater depth of 65 feet had been contemplated in the project application and the Draft.

In its comments on the Draft, SCS Engineers for Masonite criticized the floodplain benching. SCS wrote: "Artificial and unwarranted 'improvements' such as those proposed by Granite serve to upset the equilibrium of the fluvial system for the financial benefit of one landowner. This proposed channel widening is not only unneeded under current conditions, such channel manipulations have the potential to destabilize downstream banks and to shift the position of the channel thalweg with potentially negative impacts to downstream landowners. Such negative impacts may include increased potential for flooding or other unanticipated, non-linear responses that may occur . . . as a result of the proposed unwarranted mechanical manipulation of the channel. . . . [¶] . . . [T]here is little or no geomorphic or other scientific justification for such a proposal and many potential pitfalls." The Mendocino County Water Agency also expressed concerns that erosion would occur in the floodplain bench area. In response to these comments, Alternative 3 was revised in the EIR to eliminate floodplain benching from the Project. The EIR also observed that removal of floodplain benching "would not create any flooding impacts relative to the baseline condition."

After close of the period for public comment on the Draft, the California Department of Conservation Office of Mine Reclamation wrote a letter to the County noting that floodplain benching was "conspicuously absent" from the most recent version of the reclamation plan. The Department of Conservation (DOC) thought that floodplain benching "likely would provide a great benefit to the wildlife and riparian habitat along the active drainages and may provide some flood control benefit. The plans to complete the floodplain enhancement should be put back in the reclamation plan, or a reasonable justification for removing this enhancement work should be provided." Granite responded that floodplain benching was only a " 'voluntary component of the project' " that " 'added no net environmental benefit' " and was being removed " 'to avoid potential environmental impacts.' "

County staff observed that floodplain benching was "not tied to any specific environmental mitigation for the project, essentially removing the issue as a concern under CEQA." Moreover, "many of the potential impacts discussed in the [Draft]

8

regarding riparian and other wildlife habitats would be eliminated with the removal of the floodplain benching component." However, since the environmental benefits of floodplain benching were "debatable," staff did not take a position and left it up to the Planning Commission to determine whether to require floodplain benching in the Project. At the Planning Commission meeting, staff advised that Fish & Game had concerns that floodplain benching would adversely affect water quality and the habitat of the Frog. After taking comments and discussing the matter, the Planning Commission voted to approve the Project without the floodplain benching feature. Deletion of that feature was noted when the board of supervisors heard the appeals of the Planning Commission's decision.

(c) Analysis

" 'An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity' " (*Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 990), and an "unstable" description can "mislead the public and thwart the EIR process." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 655, 656). Masonite argues that Granite's inadequate and inconsistent project description prevented informed review and comment on each of the previously described changes. However, both the pond-channel connection and floodplain benching were described in the Draft, and the County received informed commentary on their merits.

Masonite argues that the EIR improperly gave several "conflicting signals" about the Project changes. (*San Joaquin Raptor Rescue Center v. County of Merced, supra,* 149 Cal.App.4th at p. 656 [description that gave "conflicting signals" about nature and scope of the activity was "fundamentally inadequate and misleading"].) Masonite makes this claim because, until the "actual approval hearing, it appeared that the floodplain benching was still an integral part of the Project." This claim is based on the EIR's response to Masonite's criticism of floodplain benching, but the response addressed Masonite's concerns and made clear that "[r]evised Alternative 3 would eliminate the channel widening component of the project." The EIR was not misleading because it

9

discussed both the potential benefits of floodplain benching and its elimination from a Project alternative. Inclusion of floodplain benching was an open issue when the EIR was prepared.

Masonite contends that information about floodplain benching was improperly "scattered here and there" in the EIR. (*Vineyard, supra,* 40 Cal.4th at p. 442 [information scatted here and there in an EIR may not adequately inform the public and decision makers].) However, there is no indication in the record that Masonite or any other interested party was misled about the nature of floodplain benching or whether it would necessarily be included in the Project. The absence of floodplain benching from the revised reclamation plan was characterized as "conspicuous[]" by the DOC. The EIR performed its role as an "informational document" with respect to the prospect for floodplain benching. (Pub. Resources Code, § 21061.) The comments for and against floodplain benching enabled the Planning Commission to intelligently weigh whether to require it. There is no merit to Masonite's arguments that the Project description was inadequate.

Nor are we persuaded that the Project changes had any "substantial adverse environmental effect" that required recirculation of the EIR. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1129, italics omitted.) Citing the Draft, Masonite asserts that use of the pond-river connection instead of the weir and fuse plug "curtailed mitigation originally requiring a Fish Rescue Plan." However, the record reflects that the EIR retained the salmonid rescue and relocation programs specified in connection with the weir and fuse plug design. Masonite also notes that adoption of the pond-river connection led to removal of a mitigation measure that mandated annual inspections and, if necessary, repair of the weir and setback areas. But as pointed out in the County staff report to the Planning Commission, the pond-river connection was considered an environmentally superior alternative, in part, because it eliminated the need for long-term maintenance of the weir.

Masonite also challenges a statement in the EIR that removal of floodplain benching "would not create any flooding impacts relative to the baseline condition." But

10

the statement was correct because the elimination of floodplain benching would simply leave Ackerman Creek and the Russian River in their present state. Masonite's arguments suggest that floodplain benching was proposed to mitigate the environmental effects of the Project, but it was not. Floodplain benching was, as Granite said, a "voluntary component" of the Project that was offered, as noted in the Draft, as "an effort to improve the current degraded state of the Ackerman Creek." The enhancement was eliminated when it appeared that it might do more environmental harm than good. Masonite is in no position to now argue for the necessity of floodplain benching because its expert told the County in comments on the Draft that floodplain benching was "[a]rtificial," "unwarranted," and "unneeded under current conditions."

(3) *The Frog*

(a) Record

Protected species of animals potentially present in the Project area were listed on a table of special status species in the Draft. The table classified the potential for occurrence at the site as "high," "medium," "low," or "unlikely." "Low potential" for a particular species was defined as follows: "The project site and/or immediate area only provide limited habitat for a particular species. In addition, the known range for a particular species may be outside of the immediate project area." The Draft discussed the Project's potentially significant impacts on species with a "medium" or "high" potential for occurrence, and provided mitigation measures designed to reduce those impacts to insignificance.

The table of special status species included the Frog. The table stated that the Frog "[b]reeds in shaded stream habitats with rock, cobble substrate, usually below 6,000 feet in elevation. Absent or infrequent when introduced predators are present." The table estimated the potential for Frog occurrence in the Project area to be "low," because: "Ackerman Creek may provide limited habitat (slow/low flow portions). Predator species present in both Ackerman Creek and Russian River." Thus, the Draft specified no mitigation measures for the Frog.

11

In its comments to the Draft, Fish & Game said that recent surveys had documented the presence of Frogs at a bridge crossing the Russian River bridge approximately three miles southeast of the Project site. Accordingly, Fish & Game believed that Frogs were "likely to exist along riparian areas of Ackerman Creek and the Russian River," and recommended that the special status species table be amended to list the potential for Frog occurrence at the site as "high," not "low."

The table was amended in the EIR. A discussion of potentially significant impacts to the Frog was added, and mitigation measures were proposed that reduced the impacts to insignificance. The impacts would arise from floodplain benching, and construction and mining operations that would impact potentially suitable upland habitat adjacent to the Russian River and Ackerman Creek. Mitigation measures included retention of current riparian vegetation to the extent possible, biological monitoring of the effects of construction on the Frog, and halting of construction if impacts to the Frog became evident.

(b) Review

Masonite argues that the EIR should have been recirculated for public comment because it contained significant new information regarding the Frog. Masonite submits the EIR disclosed "[a] new significant environmental impact" on the Frog (Guidelines, § 15088.5, subd. (a)(1)), and that the situation here is the same as that in *Sierra Club v. Gilroy City Council* (1990) 222 Cal.App.3d 30 (*Sierra Club*), where "the presence on the project site of the potentially endangered California tiger salamander was discovered after the close of the public comment period for the draft EIR. . . . The new information, the presence of the tiger salamander, demonstrated that the draft EIR had not addressed a potentially substantial adverse environmental effect. Therefore, revision and recirculation were required . . . ." (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1131.)[4] Masonite questions whether the mitigation measure adopted in the EIR for the Frog

---

[4] *Sierra Club* was disapproved on another ground in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, fn. 6.

would reduce impacts to insignificance and submits that in any event the adequacy of those mitigations should have been a topic of public comment.

Respondents maintain that Guidelines section 15088.5, subdivision (a)(2), not (a)(1), applies because under subdivision (a)(2), recirculation is necessary when a disclosure shows that "[a] substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance." Respondents argue that recirculation is not required here because, under this Guideline, mitigation measures in the EIR will reduce the newly disclosed impact on the Frog to insignificance. Respondents also distinguish the *Sierra Club* case on the ground that the Draft here at least discussed the Frog, whereas the Draft in *Sierra Club* apparently did not mention the tiger salamander. (*Sierra Club*, *supra*, 222 Cal.App.3d at p. 36.)

But Masonite has the better arguments. This case is indistinguishable from *Sierra Club* as described in *Laurel Heights II*, where recirculation was required because new information showed that an endangered species was present at the project site. We acknowledge, as respondents argue, that Guidelines section 15088.5, subdivision (a)(2) could possibly apply here. The Draft stated that the Frog's potential occurrence was "low" rather than "unlikely," and could thus be construed to disclose a possible minor impact on the Frog, and when the likelihood of the Frog's presence was changed from "low" to "high," the EIR disclosed a "substantial increase in the severity of [that] impact" (Guidelines, § 15088.5, subd. (a)(2)). But regardless of Guidelines section 15088.5, subdivision (a)(2), recirculation was required under Guidelines section 15088.5, subdivision (a)(1). We disagree with respondents' suggestion that recirculation can be avoided simply because the Draft disclosed some possible impact on the Frog. The Draft did not suggest that the Project would have any potentially significant impact on that species. Such an impact was disclosed for the first time in the EIR, and was both "new" and "significant" within the meaning of Guidelines section 15088.5, subdivision (a)(1).

A contrary conclusion would contravene *Vineyard*, *supra*, 40 Cal.4th at page 447 and *Laurel Heights II*, *supra*, 6 Cal.4th at page 1129, by depriving the public of an

opportunity to comment on mitigation measures for a potentially significant effect that were first identified in the EIR. (See also *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 308 [new information that materially implicates the public's right to participate justifies prolonging the environmental review process]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 131 [recirculation gives the public an opportunity to evaluate the new information and the validity of conclusions drawn from it].) The mitigation measures to be employed to minimize the impacts on other special status species were changed after public comment on the Draft. The same is possible for the measures to be employed to minimize impacts on the Frog. The sections of the EIR discussing the Frog must be recirculated. (*Vineyard*, *supra*, at p. 449 [discussing the scope of a recirculation].)

## C. Mitigation for Loss of Prime Farmland

Forty-five acres of the Project site are prime farmland, meaning they are "designated by the Department of Conservation FMMP [Farmland Mapping and Monitoring Program] as prime farmland, farmland of statewide importance, or unique farmland." One of the significant unavoidable effects of the project identified in the Draft is the loss of these 45 acres of prime agricultural land. Masonite contends that the County erred when it determined that no mitigation was feasible for the loss of this prime farmland. Masonite argues that this impact could have been mitigated by acquisition of agricultural conservation easements on offsite properties, or payment of "in-lieu" fees to fund such acquisitions.

(1) *Record*

The Draft explained why this impact could not feasibly be mitigated: "Mitigation for agricultural resources may take the form of avoidance, minimization, restoration, preservation, or compensation (providing substitute resources off-site). These forms of mitigation correspond to CEQA *Guidelines* Section 15370.[5] For the proposed project,

_____

[5] This Guideline provides: " 'Mitigation' includes: [¶] (a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c)

14

avoidance is not possible, as the location of the mineral resources corresponds to the prime farmland as identified in the FMMP. Minimization is incorporated into the project to an extent, as the project is phased, and agricultural activity will continue on a phase until it is mined, thus extending agricultural activity during the life of the project. . . . However, this will not reduce the impact to less than significant. Restoration is infeasible, as the mining will result in a finished grade below the groundwater level. Preservation in this instance, is similar to avoidance, and is infeasible for the same reason. Compensation generally takes the form of off-site acquisition of farmland, typically an Agricultural Conservation Easement (ACE). Acquisition of an ACE is considered infeasible for the proposed project for the reasons discussed below.

"An ACE does not replace the on-site resources, but rather, it addresses the indirect and cumulative effects of farmland conversion. Indirect effects include the pressure created to encourage additional conversions, as development pressure raises the speculative value of the land and increases the economic costs of farming due to land use incompatibilities (limitations on pesticide use, nuisance complaints due to dust and odor, vandalism, predation by domestic pets, increased traffic, etc.). Because the project site is surrounded by existing and vacant industrial uses, with the exception of the west side, it is unlikely that this project would affect neighboring agricultural uses. There are agricultural uses to the east, but they are separated by the natural barrier of the Russian River. In addition, the end use of the property is open space (including habitat), rather than urban developments. Open space is compatible with agriculture, and would not create indirect development pressure on agricultural lands.

"Therefore, feasible mitigation measures are not available, and this impact would be significant and unavoidable." (Italics and bold type deleted.)

---

Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e) Compensating for the impact by replacing or providing substitute resources or environments."

The DOC expressed concerns about the loss of agricultural lands as an unavoidable impact of the Project in its comments on the Draft. According to the DOC, the loss should have been minimized through the acquisition of ACEs on comparable land of at least equal size. The DOC considered this means of mitigation to be a common and appropriate means of mitigating the loss of prime farmland. According to the DOC: "Mitigation via agricultural conservation easements can be implemented by at least two alternative approaches: the outright purchase of easements or the donation of mitigation fees to a local, regional or statewide organization or agency whose purpose includes the acquisition and stewardship of agricultural conservation easements. The conversion of agricultural land should be deemed an impact of at least regional significance. Hence, the search for replacement lands should be conducted regionally or statewide, and not limited strictly to land within the project's surrounding area."

The County did not respond to these comments except to note that no Williamson Act[6] contracts would be affected by the Project, and cite to the discussion of mitigation for lost farmland in the Draft. The Draft's discussion of the infeasibility of such mitigation was incorporated into the EIR without change.

When Masonite appealed the Planning Commission decisions to the Board of Supervisors, it said there was no "logical basis" for the conclusion that impacts to agricultural land could not be mitigated. At the hearing on the appeal, a County representative responded that "[t]he basic purpose of an agricultural conservation easement is to avoid the secondary impacts that are associated with conversion of agricultural land. You know, sometimes considered the so called domino effect. As you extinguish operations, now you're putting development pressure on the next farmer and you're causing nuisance issues that are going to make life difficult for him and make it

---

[6] "A Williamson Act contract obligates the landowner to maintain the land as agricultural for 10 or more years, with resulting tax benefits. ([Gov. Code,] §§ 51240-51244.) Absent contrary action, each year the contract renews for an additional year, so that the use restrictions are always in place for the next nine to 10 years. (*Id*., § 51244.)" (*Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 195.)

16

more likely that that operation is going to want to sell. . . . So that's really what you're doing because you're not replacing the resources. We can put an easement somewhere else but it[']s not going to recreate those few acres of prime farmland that are present on that site now. So that's how we approach that analysis and you have to look at the circumstances of the project. . . . The nearest active agricultural operation is across the Russian River, which acts as a natural barrier in terms of what I would call these nuisance or domino effects. . . . [S]o given that, the conclusion of County Staff was that an agricultural easement was not the appropriate response in this case."

(2) *Review*

(a) Agricultural Conservation Easements

CEQA provides that "public agencies should not approve projects as proposed if there are . . . feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." (Pub. Resources Code, § 21002; see also *id.* at § 21002.1, subd. (b) [agencies must mitigate significant effects of projects they approve "whenever it is feasible to do so"].) CEQA defines "feasible" to mean "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.) Agency findings regarding whether mitigation measures are feasible are generally reviewed for substantial evidence. (See, e.g., *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 350-351 (*Beaumont*).) But not in this case.

Here, the determination that no mitigation was feasible for the loss of farmland rested on a conclusion that offsite agricultural conservation easements (ACEs) cannot mitigate for the land lost at the Project site because they would "not replace the on-site resources." The County presumed that ACEs were useful only to address "the indirect and cumulative effects of farmland conversion," and were not needed here because the Project would have no such effects. Thus, the finding of infeasibility in the EIR rested on the legal conclusion that while ACEs can be used to mitigate a project's indirect and cumulative effects on agricultural resources, they do not mitigate its direct effect on those

17

resources.  As respondents put it in the trial court:  "Given the lack of indirect or cumulative agricultural impacts, the Draft EIR properly conclude[d] that agricultural conservation easements are legally infeasible."  The legal feasibility of a mitigation measure is not a question of fact reviewed for substantial evidence but rather is an issue of law that we review de novo.

We disagree with respondents.  We conclude that ACEs may appropriately mitigate for the direct loss of farmland when a project converts agricultural land to a nonagricultural use, even though an ACE does not replace the onsite resources.  Our conclusion is reinforced by the CEQA Guidelines, case law on offsite mitigation for loss of biological resources, case law on ACEs, prevailing practice, and the public policy of this state.

ACEs preserve land for agricultural use in perpetuity.  (See Civ. Code, §§ 815.1, 815.2 [describing agricultural and other conservation easements]; Pub. Resources Code, § 10211 [defining "agricultural conservation easements"].)  As the California Farm Bureau Federation (CFBF) observes in an amicus curiae brief advocating for the conclusion we reach:  "The permanent protection of existing resources off-site is effective mitigation for [a project's direct, cumulative, or growth-inducing] impacts because it prevents the consumption of a resource to the point that it no longer exists. . . . If agricultural land is permanently protected off-site at, for example, a 1:1 replacement ratio, then at least half of the agricultural land in a region would remain after the region has developed its available open space."  By thus preserving substitute resources, ACE's compensate for the loss of farmland within the Guidelines' definition of mitigation. (Guidelines, § 15370, subd. (e) [mitigation includes "[c]ompensating for the impact by replacing or providing substitute resources or environments"].)

There is no good reason to distinguish the use of offsite ACEs to mitigate the loss of agricultural lands from the offsite preservation of habitats for endangered species, an accepted means of mitigating impacts on biological resources.  (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 278 (*Santee*) [loss of habitat mitigated by conservation of other habitat at a 1:1 ratio]; *California Native Plant Society v. City of*

18

*Rancho Cordova* (2009) 172 Cal.App.4th 603, 610-611, 614-626 [mitigation by offsite preservation of two acres of existing habitat or creation of one acre of new habitat for each acre of habitat impacted by the project]; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794 [mitigation by "off-site preservation of similar habitat"]; *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1038 [purchase of a half-acre for habitat reserves for every acre of development]; see also Kostka et al., Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2009) § 14.8, p. 692 (Kostka) [acquisition and enhancement of species habitat provide a substitute resource under Guidelines, § 15370, subd. (e)].)  Indeed, the DOC's comments  on the Draft recognized that the rationale for ACEs in this case parallels that of established mitigation for loss of wildlife habitat.

Our conclusion is also supported by the relatively sparse case law involving ACEs.  The case most closely on point is *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296 (*Lodi*), which involved a project that, similar to the one here, converted 40 acres of prime farmland to other uses.  The EIR determined that the impact on agricultural resources was unavoidably significant, and the developer was nonetheless required to mitigate the impact by obtaining an ACE over 40 other acres of prime farmland.  (*Id.* at pp. 322-323.)  Although the EIR observed that " 'such off-site mitigation would not avoid the significant impact resulting from the permanent loss of prime agricultural lands at the project site' " (*id.* at p. 323), the court noted that acquisition of the offsite ACE "would minimize and substantially lessen" that impact (*id.* at p. 324).  The *Lodi* court's reasoning refutes respondents' theory that mitigation through use of an offsite ACE is not legally feasible.

In *Beaumont*, *supra*, 190 Cal.App.4th 316, the EIR for a housing development on land long used for agricultural purposes noted that there was " 'no feasible long-term mitigation [for the impact on agricultural resources] other than placing large blocks of farmland into conservation easements, Williamson Act preserve status, or other temporary protection or preservation plans.' "  (*Id.* at p. 349 [italics omitted].)  But the EIR rejected those mitigation measures as economically infeasible because the pace of

19

urban development made long-term farming no longer financially viable, a conclusion that was upheld as supported by substantial evidence. (*Id.* at pp. 350-351, citing *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1269-1271 [offsite preservation of agricultural land was infeasible because of "the negative economics of long-term agriculture" in Orange County].) There would have been no need for the EIR or the court in *Beaumont* to address the economic feasibility of ACEs if, as respondents argue, ACEs are not legally feasible. Nor does *Beaumont* support respondents' claim that we should review the infeasibility determination in this case for substantial evidence. Because the County decided that ACEs were not a legally feasible means to mitigate the loss of farmland at the Project site, it never investigated whether ACEs were economically feasible, and there is no evidence to review.

*Building Industry Assn. of Central California v. County of Stanislaus* (2010) 190 Cal.App.4th 582 (*Stanislaus*), involved a challenge to a county general plan that required developers of projects converting agricultural land to residential use to obtain ACEs on farmland of equal quality in the county at a 1:1 ratio, or pay "an in-lieu mitigation fee." (*Id.* at p. 588.) The court concluded that these mitigation requirements were reasonably related to the adverse public impact of such projects and thus an authorized use of the county's police power. The court observed that a residential project would not be approved "until the developer provides permanent protection of one acre of farmland for every acre of farmland converted to residential use. Agricultural conservation easements granted in perpetuity are the primary means of accomplishing this permanent protection requirement. . . . [¶] . . . [¶] . . . Although the developed farmland is not replaced, an equivalent area of comparable farmland is permanently protected from a similar fate." (*Id.* at p. 592.) *Stanislaus* teaches that ACEs are a reasonable means to mitigate the impact of a project that replaces agricultural land.

Moreover, it appears that ACEs are commonly used for that purpose. The DOC described ACEs in its comments as "accept[ed] and use[d] by lead agencies as an appropriate mitigation measure under CEQA," and the administrative record includes evidence that ACEs are so employed by a number of cities and counties. The EIR at

20

issue in *Lodi* stated that acquisition of ACEs over acreage equal to the agricultural acreage lost due to a project is " 'standard for California communities.' " (*Lodi*, *supra*, 205 Cal.App.4th at p. 322.)  " 'In addition to the City of Lodi, the following agencies in the surrounding area apply the 1:1 mitigation ratio:  cities of Stockton and Elk Grove, counties of San Joaquin and Stanislaus, Tri-Valley Conservancy (Livermore/Alameda County).' "  (*Ibid.*)  This authority suggests that the County is an outlier in believing that ACEs cannot feasibly be used to mitigate the conversion of prime farmland to other uses.

We note finally that our Legislature has repeatedly stated the preservation of agricultural land is an important public policy.  (Gov. Code, § 51220, subd. (a) ["the preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources, and is necessary not only to the maintenance of the agricultural economy of the state, but also for the assurance of adequate, healthful and nutritious food for future residents of this state and nation"]; Pub. Resources Code, § 10201, subd. (c) ["Agricultural lands near urban areas that are maintained in productive agricultural use are a significant part of California's agricultural heritage. . . .  Conserving these lands is necessary due to increasing development pressures and the effects of urbanization on farmland close to cities."]; Civ. Code, § 815 ["the preservation of land in its natural, scenic, agricultural, historical, forested, or open-space condition is among the most important environmental assets of California"].)  The Legislature has also declared that CEQA is intended to effectuate this public policy. (Stats. 1993, ch. 812, § 1, p. 4428 ["(a)  Agriculture is the state's leading industry . . . . [¶] . . . [¶] (c)  The conversion of agricultural lands to nonagricultural uses threatens the long-term health of the state's agricultural industry. [¶] (d)  The California Environmental Quality Act plays an important role in the preservation of agricultural lands."].)  To categorically exclude ACEs as a means to mitigate the conversion of farmland would be contrary to one of CEQA's important purposes.  We agree with the CFBF that ACEs should not "be removed from agencies' toolboxes as available mitigation" for this environmental impact.

21

For these reasons, the EIR's determination that ACEs are legally infeasible cannot be sustained. The economic feasibility of off-site ACEs to mitigate the Project's impact on the loss of 45 acres of prime farmland must be explored.

(b) <u>In-Lieu Fees</u>

As an alternative to the outright purchase of ACEs, the DOC comment letter recommended "the donation of mitigation fees to a local, regional or statewide organization or agency whose purpose includes the acquisition and stewardship of [ACEs]." Masonite argues that the EIR was deficient because it did not address this suggestion. The County responds, saying it was legally precluded from accepting in-lieu fees because it does not have a comprehensive farmland mitigation program.

We agree with Masonite that the EIR should have addressed the DOC comment and given reasons for rejecting the DOC's proposal. (Guidelines, § 15088, subds. (a) & (c) [responses with reasoned analysis are required.) Again, we are not persuaded by respondents' argument for legal infeasibility. The DOC was not advocating payment of in-lieu fees to a county program, but rather to third parties involved in acquiring and overseeing ACEs. Whether the County lacks a comprehensive farmland mitigation program is immaterial, and does not explain why in-lieu fees are not feasible mitigation. This issue requires further analysis in the EIR.

**D. Cumulative Impacts on Farmland**

The discussion of the Project's cumulative impacts on agricultural resources, set forth in section 5.2.3 of the Draft and incorporated without change in the EIR, reads in full: "Some of the land in the vicinity of the proposed project is considered highly productive farmland, although a majority of it is located on the eastern side of the Russian River. A large portion of the project site is classified as Prime Farmland by the Department of Conservation's Farmland Mapping and Monitoring Program (Draft, 2006). Once mining ceases, the project site would be reclaimed to open space. [¶] Cumulative conversion of important farmland was determined to be less than significant in the General Plan EIR. The project site is zoned for industrial use, and no

22

adjacent lands currently in agriculture are planned for a conversion to urban use. The project would therefore not contribute to a significant cumulative effect."

Masonite contends that this discussion improperly relied on the prior general plan EIR without tiering from it or incorporating it by reference in the EIR for the Project, and that the discussion was factually inadequate because the information in the general plan EIR was insufficient to support the determination that the Project's cumulative effect on farmland would be insignificant. For reasons we shall discuss, we agree with Masonite on both points.

Respondents assert that "[c]umulative impacts in the agricultural context are more properly defined as the Project's potential to result in indirect impacts to surrounding agricultural resources and, as such, cause subsequent conversions in the future." Based on this premise, respondents reason that because the Draft shows that the Project "will not cause the conversion of other prime farmland," it also shows that the Project "will not result in a cumulative impact." But indirect and cumulative impacts are not the same and they entail separate analysis. (Compare Guidelines, §§ 15064, subd. (d)(2) & 15358, subd. (a)(2) [defining indirect effects] with Guidelines, §§ 15065, subd. (a)(3) & 15355 [describing cumulative effects]; see also *Santee*, *supra*, 210 Cal.App.4th at p. 278 [distinguishing a long-term indirect impact from a cumulative impact].) The Draft's analysis of cumulative, as opposed to indirect, impacts consists of a single sentence that states: "Cumulative conversion of important farmland was determined to be less than significant in the General Plan EIR."

"A pertinent discussion of cumulative impacts contained in one or more previously certified EIRs may be incorporated by reference pursuant to the provisions for tiering and program EIRs." (Guidelines, § 15130, subd. (d).) However, an EIR that uses incorporation by reference or tiering must do so expressly. (*Vineyard*, *supra*, 40 Cal.4th at p. 443.) It must indicate where the earlier document is available for inspection, briefly summarize or describe the pertinent parts of earlier document, and describe how they relate to the current project. (Guidelines, § 15150, subds. (b) & (c), § 15152, subd. (g); *Kostka*, *supra*, § 10.11, p. 501.) This information is required to "give the reader a . . .

23

road map to the information [the EIR] intends to convey." (*Vineyard*, *supra*, 40 Cal.4th at p. 443.) The EIR here was deficient because it provides no such road map.

Respondents' brief indicates that the EIR was relying on the following discussion of cumulative impacts of the draft EIR for the 2009 update of the County's general plan (2009 Update Draft): "Although implementation of the General Plan would change land use designations, the result would be a minor loss of designated agricultural lands . . . that would not be considered a substantial loss of agricultural land in the county. Additionally, policies in the proposed General Plan Update support the preservation of agricultural lands and farming operations in the county. Therefore, the proposed General Plan Update would not result in a cumulative loss of agricultural lands."

Respondents argue that neither tiering nor incorporation by reference was required here because the County was merely relying on the general plan EIR as evidence to support the determination in the EIR that the Project would not substantially contribute to the loss of farmland. Surely, respondents cannot be saying that because the general plan EIR determined that changing land use designations would not cause a substantial loss of agricultural land within the county, no particular project consistent with the general plan could cause such a loss. There is a vast difference between land use designations that permit several alternative uses of property in a geographic area, and the approval of a specific project that changes the character of a particular property. Nor do we understand the general plan EIR to mean that no substantial loss to the County's agricultural resources would occur if all the agricultural land in the county designated for other possible uses were to be so converted, or that no such other conversion would be approved. The general plan EIR acknowledges the importance of preserving prime agricultural land, and while there may be no projects in the pipeline that will similarly convert agricultural land, the EIR does not attempt to quantify the future of the County's agricultural resources in any meaningful way.

We recognize that "standards of practicality and reasonableness" govern cumulative impacts analysis, and that such impacts need not be discussed in as much detail as the direct impacts of a project. (Guidelines, § 15130, subd. (b).) But we are not

persuaded the discussion of cumulative impacts in the EIR is sufficient. Under the Guidelines, "an adequate discussion of significant cumulative impacts" requires either "[a] list of past, present, and probable future projects producing related or cumulative impacts," or "[a] summary of projections [in, among other things, a certified EIR for an adopted local plan] that describes or evaluates conditions contributing to the cumulative effect." (Guidelines, § 15130, subds. (b)(1)(A) & (b)(1)(B).) The discussion in the 2009 Update Draft includes neither of these "necessary elements." (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 928.)

Because the general plan amendments were concerned only with zoning changes, the amendments did not consider projects like the one under review that convert farmland to another use without any such change.[7] Since the 2009 Update Draft does not address such conversions, the 2009 Update cannot be relied upon as a comprehensive "summary of projections" of cumulative impacts on agricultural lands. Despite the County policies that favor preservation of agricultural land, the 2009 Update Draft acknowledges: that "the proposed General Plan Update would not explicitly preclude the conversion of farmlands of concern under CEQA [Prime Farmland of Statewide Importance, and Unique Farmland] to other uses in the future"; and that "[s]ubsequent land use activities associated with implementation of the proposed General Plan Update, in combination with existing, approved, proposed, and reasonably foreseeable development in the region, would contribute to the additional conversion of important farmlands to other uses and

---

[7] The amendments' limited focus and their failure to account for the Project are shown by the discussion of Impact 4.2.1 in the 2009 Update Draft, which, as revised in the final EIR for the 2009 update, states: "Overall, as a result of the approved land use changes, 82.10 acres of agricultural lands (including agriculture, farm land and forest land) would be converted to another land use designation. Of the total vacant land in the county (1,881,946.1 acres), the net loss of 82.10 acres of agricultural lands would be approximately 0.000044 percent of land within the county. Out of the 82.10 acres of vacant agricultural lands associated with the proposed land use changes, only 1.82 acres are prime agricultural land, which equals only 0.02 percent of potential prime agricultural land lost with the proposed land use changes. . . . [¶] . . . [¶] . . . Out of the 736.46 vacant acres proposed for land use changes in the proposed General Plan Update, there are approximately 0.94 acres of Prime Farmland and 10.68 acres of Unique Farmland."

may increase agriculture/urban interface conflicts." The County's more general agricultural preservation policies do not salvage the cumulative impacts analysis.

Thus, the discussion of cumulative impacts on agricultural resources "suffers from both procedural and factual flaws." (*Vineyard*, *supra*, 40 Cal.4th at p. 447.)

## E. Roadway Mitigation

(1) *Record*

The plan is for aggregate mined in the Project to be removed from the site by trucks travelling on Kunzler Ranch Road to North State Street. There appears to be no dispute that Kunzler Ranch Road is the only point of ingress and egress to the Project site. The Draft estimated that the mining could involve up to 176 truck trips per day each hauling 25 ton loads.

According to the Draft,"[l]ocal roadways, such as Kunzler Ranch Road and North State Street . . . are generally not designed to accommodate heavy vehicles, and truck travel on these roads would have the potential to adversely affect the pavement condition. Roadway damage can include conditions such as loose asphalt and potholes that have the potential to make driving conditions less safe. Roadways significantly impacted from project truck traffic would have to be upgraded to support vehicle weights up to 25 tons. [¶] . . . [¶] . . . [T]he project would have a significant impact on Kunzler Ranch Road and a less than significant impact on North State Street. [¶] . . . [¶] The project applicant has recently prepared an assessment of *Kunzler Ranch Road, Kunzler Ranch Road Pavement Evaluation and Rehabilitation Strategies*, April 28, 2009. This report was submitted to the County and provides a detailed assessment of current roadway conditions and a comprehensive plan to rehabilitate and maintain the roadway over a 30 year period. The report identified Kunzler Ranch Road as being in serious condition and identifies various alternatives for addressing the condition of the road."[8]

To mitigate this significant impact, the Draft "recommended that Kunzler Ranch Road be improved as needed (e.g., overlays or reconstruction) per the April 28, 2009

---

[8] This pavement report is not included in the Draft or EIR.

26

Kunzler Ranch Road study and the Caltrans Design Manual standards. The project applicant would pay the full cost of road improvements, including design and construction. [¶] Prior to operations the project applicant shall enter into a Roadway Maintenance Agreement with Mendocino County providing their proportionate share of the responsibility to maintain the proposed haul roads." (Italics omitted.)

When it commented on the Draft, the County Department of Transportation (MDOT) clarified that "Kunzler Ranch Road is not a County maintained road and that MDOT has no involvement in its operation, maintenance, or upkeep. . . . [¶] . . . [¶] . . . Therefore there is no need for the applicant to enter into a Road Maintenance Agreement with the County for maintenance of Kunzler Ranch Road." The MDOT further stated: "Arriving at a cost sharing arrangement is the responsibility of the applicant, the road's owner(s) and those property owners having rights to its use. [¶] . . . [¶] . . . Ideally, all the users of Kunzler Ranch Road would voluntarily form a Road Maintenance Organization for the improvement and maintenance of the road. [However,] no party can unilaterally make this happen . . . ."

The MDOT proposed an alternative means to mitigate the significant impact to Kunzler Ranch Road, and it was adopted nearly verbatim in the EIR. The EIR states: "Traffic-related repairs on Kunzler Ranch Road shall be initiated when the owners of the road and users of the easement reach a decision that such repairs are necessary. Granite's fair share shall be calculated based on the proportion of applicant's heavy truck trips to the total number of heavy truck trips on the road that year. Consistent with Civil Code Section 845, in the absence of a road maintenance agreement, applicant shall be required to pay its fair share of the cost and expense incurred for traffic-related repairs of Kunzler Ranch Road."[9]

---

[9] This statute requires the owner "of any easement in the nature of a private right-of-way, or of any land to which any such easement is attached [to] maintain it in repair." (Civ. Code, § 845, subd. (a).) If there are multiple such owners, they will share the costs pursuant to any agreement they reach or, in the absence of an agreement, in proportion to their use of the easement. (*Id.* at subd. (b).) The statute provides for court enforcement of that proportionate obligation. (*Id.* at subd. (c).)

(2) *Review*

Masonite argues that the mitigation measures for the Project's impact on Kunzler Ranch Road are inadequate for several reasons. The measures provide for "repairs" rather than "improvements" to the road. The measures are unenforceable and impermissibly deferred. And the provisions for fair share payments by Granite are ineffectual because they are not "part of a reasonable plan of actual mitigation that the [County has] commit[ted] itself to implementing." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1188 [discussing fee-based mitigation programs for cumulative traffic impacts].)

Most of Masonite's arguments are unconvincing. "[M]easures to mitigate or avoid significant effects on the environment [must be] fully enforceable through permit conditions, agreements, or other measures." (Pub. Resources Code, § 21081.6, subd. (b).) The mitigation measures for the road are enforceable because they were included among the conditions for approval of the Project, allowing the County to withdraw that approval if Granite fails to make the required payments. (See *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1116 (*Madera*) [mitigations were enforceable "because they were incorporated as part of the conditional approval" of the use permits].) The provision for "repairs" is most reasonably construed to include "improvements" to the road to accommodate the increased truck traffic. There is no reason to doubt the County's commitment to enforce the mitigation measures.

But Masonite makes a valid point when it says the roadway mitigation measures have been unjustifiably deferred. The mitigation measures do not specify when the fair share payments will be made or what improvements must be funded. The EIR states that the payments are to be made when the interested private parties decide they are necessary or, in the absence of an agreement, "[c]onsistent with Civil Code section 845." These provisions leave the timing of the payments uncertain. (Compare *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 916 [mitigations that were "specific and contain[ed] identifiable timelines" were not "impermissibly delayed"].) Moreover, no standards are set to ensure that the mitigation will be effective. Here, as in

28

*Madera*, the proposed mitigations are not so vague as to be unenforceable, but sufficiently vague as to "impact [the] analysis of their viability and effectiveness." (*Madera*, *supra*, 167 Cal.App.4th at p. 1116.) The *Madera* court "[g]enerally agree[d] that CEQA permits a lead agency to defer specifically detailing mitigation measures as long as the lead agency commits itself to specific performance standards," but the county there, like Mendocino here, had not made that commitment, and the mitigation measures were found to be inadequate under CEQA. (*Id.* at pp. 1119, 1120; see also *Santee*, *supra*, 210 Cal.App.4th at pp. 280-282 [without performance standards or guidelines mitigation was improperly deferred].)

The County emphasizes that the mitigation measures were changed only after it discovered that it had no jurisdiction over the road. But while that discovery may have obviated the need for a roadway maintenance agreement between respondents, it did not justify deletion of criteria for the roadway improvements such as those specified in the Draft. If " ' "practical considerations prohibit devising [mitigation] measures early in the planning process . . . the agency can commit itself to eventually devising measures that will satisfy specific performance criteria . . . ." ' " (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906.) But this is not such a case. According to the Draft, Granite had completed a study that included a "comprehensive plan to rehabilitate and maintain the roadway over a 30 year period." The Draft discussed Caltrans Highway Design Manual standards, and required improvements to the road pursuant to those standards and the Granite study. In the absence of those criteria or others for the improvements, there is no substantial evidence to support the EIR's finding that the impact of the Project on Kunzler Ranch Road will be mitigated to insignificance. (*Vineyard*, *supra*, 40 Cal.4th at p. 427 [scope of review of factual determinations].)

**F. Discussion of Alternatives**

Masonite contends that the EIR did not adequately evaluate offsite or onsite alternatives to the Project.

(1) *Offsite Alternatives*

The Draft's analysis of offsite alternatives, incorporated without change in the EIR, considered nine alternative mining sites in the Ukiah area, discussed one of them as an offsite alternative, and rejected the other eight as infeasible. Masonite says there was no reason for limiting consideration of alternative sites to those within the Russian River corridor in the immediate area of Ukiah, and suggests that a county-wide range of alternative sites should have been explored.

"CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts," and an EIR must only consider "a range of reasonable alternatives to the project." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566, italics omitted.) "There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason." (Guidelines, § 15126.6, subd. (a).)

In February 2009 correspondence, Granite identified various factors to be considered in selecting and evaluating alternative Project sites, such as "[l]ocation (the site must be in the Ukiah market area and close to Granite owned PCC [concrete] & HMA [asphalt] aggregate facilities)," "[c]ompatibility with surroundings (e.g. mining in an industrial area, like Kunzler, would likely be compatible with its surroundings)," and "[a]esthetics (e.g. not in the direct view shed of the State Highway)." Proximity to Granite's local asphalt and concrete processing plants could reasonably be regarded as important considerations because, as Granite noted, "distance increases the potential for significant environmental impacts from truck transportation of aggregates." We therefore disagree with Masonite that limiting the discussion of offsite alternatives to those in the Ukiah area was unreasonable and unduly restrictive.

(2) Onsite Alternative

Masonite argues that the onsite alternative evaluated in the EIR—Alternative 3— was inadequate because it did not offer substantial environmental advantages over the project as proposed. (See *Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 566 [EIR must consider a reasonable range of feasible alternatives that "offer

30

'substantial environmental advantages' over the project as proposed"].)  Masonite reasons that Alternative 3 offered no substantial environmental advantage over the weir and fuse plug originally contemplated because its pond-river connection would have the same environmental effect:  reduction of the salmonid pit capture impact to insignificance.  But while both designs could broadly speaking be found to have comparable effects, NMFS believed that the environmental advantage of Alternative 3 was sufficiently substantial to advocate for it, and its enhanced protection for salmonids could reasonably be considered a substantial advantage given that such protection was a central environmental issue for the Project.

Masonite asserts that "Alternative 3 did not offer any change in operations or the size of the Project, and therefore the EIR's range of onsite alternatives was impermissibly narrow."  (See *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1086-1088 [EIR should have discussed reduced development alternative even if the alternative would not accomplish all of the project's objectives].)  However, in response to comments on the EIR from NMFS regarding anaerobic conditions that could develop in the ponds, Granite agreed to mine to a lesser depth than planned in the Project application and the Draft.  (See fn. 3, *ante*.)  At the Planning Commission meeting, Granite estimated that this change would reduce the amount of aggregate mined by 10 to 15 percent.   Thus, Alternative 3 as finally approved did in fact reduce the scale of the Project.  Masonite's challenges to Alternative 3 are without merit.

## III.  DISPOSITION

The judgment denying the petition for writ of mandate is reversed, with directions to issue a writ requiring the County to set aside its certification of the EIR, set aside its approvals of the conditional use permit and reclamation plan for the Project, and prepare and circulate a supplemental EIR, which includes the EIR's provisions pertaining to the Frog, and addresses the deficiencies we have identified in the EIR concerning:  the feasibility of ACEs and in-lieu fees as mitigation for the Project's conversion of farmland to nonagricultural use; the discussion of cumulative impacts on agricultural resources;

31

and the efficacy of the mitigation measures for truck traffic on Kunzler Ranch Road. Costs on appeal to Masonite.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Pollak, J.

Trial Court:                                    Superior Court of Mendocino County

Trial Judge:                                    Hon. John A. Behnke

Counsel for Petitioner and Appellant:           Christian Lucier Marsh
    Masonite Corporation                        DOWNEY BRAND

                                                David Ivester
                                                BRISCO, IVESTER & BAZEL

Counsel for Defendant and Respondent:           Jeanine B. Nadel
    Mendocino County et al.

                                                Terry Nan Gross
                                                OFFICE OF THE COUNTY COUNSEL

Counsel for Real Party in Interest and
Respondent:                                     Mark David Harrison
    Granite Construction Company                HARRISON TEMBLADOR
                                                HUNGERFORD & JOHNSON

*Masonite Corporation v. County of Mendocino*, A134896