Filed 9/21/23  Preserve Wild Santee v. City of Santee CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PRESERVE WILD SANTEE et al., | D080664 |
| Plaintiffs and Appellants, | |
| v. | |
| CITY OF SANTEE et al., | (Super. Ct. No. 37-2020-00038168-CU-WM-CTL) |
| Defendants and Respondents; | |
| HOMEFED FANITA RANCHO, LLC, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Center for Biological Diversity, John Buse, Peter Broderick and Aruna Prabhala for Plaintiffs and Appellants.

Best Best & Krieger, Shawn D. Hagerty, Amy E. Hoyt and Amanda E. Daams for Defendants and Respondents, City of Santee.

Allen Matkins Leck Gamble Mallory & Natsis, Jeffrey A. Chine and Heather S. Riley for Real Party in Interest and Respondent, HomeFed Fanita Rancho, LLC.

Preserve Wild Santee, Center for Biological Diversity, Endangered Habitats League and California Chaparral Institute (Appellants) appeal from one portion of a judgment on a petition for writ of mandate challenging the adequacy of an Environmental Impact Report (EIR) for a proposed residential development in the city of Santee. The trial court found the EIR violated the California Environmental Quality Act (CEQA) (Pub. Resource Code, § 2100 et. seq.)[1] on several grounds and issued a peremptory writ of mandate requiring the City of Santee and the Santee City Council (collectively, the City) to set aside its certification. However, the trial court upheld the City's finding that the proposed mitigation measures—including, most notably, the creation of an onsite habitat preserve (Preserve) with management and funding in perpetuity—would reduce the impacts to coastal California gnatcatcher songbirds to a less than significant level.

Appellants contend that the proposed mitigation measures are inadequate, and that the onsite Preserve amounts to nothing more than a "preserve-what's-left approach" that fails to offset the destruction of nearly 400 acres of gnatcatcher habitat.

The City, together with real party in interest HomeFed Fanita Rancho, LLC, (collectively, Respondents) assert that the Preserve qualifies as an acceptable mitigation measure, consistent with section 15370 of the CEQA Guidelines, and that substantial evidence supports the City's findings regarding the gnatcatchers. They argue further that Appellants failed to exhaust their administrative remedies, as required by CEQA, because they

---

[1] Unless otherwise stated, all statutory citations herein are to the Public Resources Code. Subsequent references to "Guidelines" are to the CEQA guidelines found in California Code of Regulations, title 14, section 15000 et seq.

did not raise these specific arguments during the public comment period. (§ 21177, subd. (a).)

We conclude that it is the City that has waived its argument regarding exhaustion, but that substantial evidence supports the City's findings regarding the gnatcatcher mitigation measures. Accordingly, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Project Site and Prior Litigation*

The present litigation arises from the latest iteration of the Fanita Ranch Project (the Project) proposed by HomeFed Fanita Rancho, LLC (HomeFed). The Project site consists of approximately 2,600 acres on the northern edge of the City of Santee in the eastern portion of the County of San Diego. It borders the Marine Corps Air Station Miramar, Santee Lakes Recreation Preserve, and other open space areas including the Goodan Ranch Regional Park and the Sycamore Canyon Open Space Preserve to the north and west, and various other residential neighborhoods to the south and east.

The County of San Diego Community Plan designated the Project site for development of approximately 14,000 dwelling units when the City of Santee was first incorporated in 1980. But the site is also "a key part of the City's participation in the Multiple Species Conservation Program (MSCP)," which "calls for the preservation and management of approximately 900 square miles in the County of San Diego." This is because much of the site is covered by coastal sage scrub, chaparral and native valley needlegrass grassland, which are sensitive habitats home to numerous endangered, threatened and rare wildlife species, including, as relevant here, more than a dozen nesting pairs of the coastal California gnatcatcher (the gnatcatcher), a small songbird protected under the federal Endangered Species Act (50 CFR

3

§17.11(h)). The majority of the land has therefore been designated as critical habitat by the United States Fish and Wildlife Services (USFWS). Given these competing interests, the site has been the subject of various development proposals and ballot measures over the last 40 years, at least some of which have resulted in extensive CEQA litigation.[2]

Previously, in 2007, the City certified a final EIR and approved a project that would have resulted in the construction of 1,380 single-family dwelling units, 15 live-work units, and commercial mixed-used space, clustered into four villages on approximately 969 acres within the Project site. Litigation ensued and the courts, including this court, found portions of the EIR did not adequately analyze or address the potential impacts to biological resources, the water supply or fire safety. (See *Preserve Wild Santee*, *supra*, 210 Cal.App.4th at pp. 267–269 [noting the trial court concluded there was insufficient evidence to support the EIR's findings regarding fire safety impacts, and further concluding the EIR improperly deferred mitigation impacting the Quino checkerspot butterfly and inadequately analyzed water supply impacts].) As a result, the City decertified the EIR and vacated the project approvals.

B. *The Current Project and Draft EIR*

In August 2018, HomeFed submitted an application that modified the prior project proposal. Under the current proposal, the Project would include up to 3,008 residential housing units, up to 80,000 square feet of commercial development, and associated infrastructure. The development would be

---

[2]    See, e.g., *Preserve Wild Santee et al. v. City of Santee et al.*, San Diego Superior Court case Nos. 37-2008-00075168-CU-TT-CTL and 37-2009-00097042-CU-TT-CTL; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 270 (*Preserve Wild Santee*).)

concentrated in two inter-connected "clusters" on the northern edge of the Project site, leaving approximately 1,650 acres—63 percent of the total 2,600-acre site—to be designated as a Preserve, as shown in the following conceptual land use plan:



Source: Fanita Ranch Specific Plan 2020.

The City of Santee, the lead agency for the Project, provided notice that it was preparing a revised draft EIR (Draft EIR) for the Project in late 2018.

The Draft EIR "fully evaluates the proposed project as a modification of the prior project while also addressing any applicable portions of the earlier environmental analysis for the prior project approved in 2007 that were found inadequate by the trial and appellate courts." It "evaluates every potential impact area under CEQA for the proposed project and is not limited to those areas found inadequate for the project approval in 2007."

Given the limited nature of the present appeal, we focus our discussion on the portions of the Draft EIR (and the final revised EIR) addressing the impacts of the Project on the gnatcatcher. In describing the potential biological impacts, the Draft EIR relies heavily on a separate Biological Technical Report, which, in turn, sets forth the findings of focused surveys of sensitive wildlife and plant species on the Project site, including the gnatcatcher. Of relevance here, the Biological Technical Report indicates that surveyors observed approximately 39 gnatcatcher use areas[3] and 42 individual gnatcatchers within the Project site between April and June 2016.

Relying on the Biological Technical Report, the Draft EIR finds that implementation of the Project "would result in impacts to 987.58 acres of Critical Habitat for coastal California gnatcatcher, including both permanent and temporary impacts; however, only 399.19 acres would be considered suitable habitat for this species," and of that 399.19 acres, only 339.60 would

---

[3]     The Biological Technical Report defines a "coastal California gnatcatcher use area . . . as a specific area of habitat that each coastal California gnatcatcher pair was observed utilizing (i.e., nesting and/or foraging in) during the 2016 survey effort."

be permanently impacted.[4]  "Impacts would occur to 12 coastal California gnatcatcher use areas within the designated Critical Habitat area."  In an associated table, the Draft EIR indicates the Project would result in impacts to 427.85 acres and 14 use areas.  Although not expressly stated, it appears the slight difference in numbers may result from the later figure including impacts from a proposed maintained trail system within the Preserve.

The following map, reproduced from the Biological Technical Report, provides a visualization of the foregoing information, including the observed gnatcatcher use areas, the areas of gnatcatcher habitat that would be temporarily and permanently impacted, and the areas that would be designated as Preserve:

---

[4]     As explained in the Draft EIR, "[i]t should be noted that the USFWS modeling used to prepare the proposed Critical Habitat designations is based on a combination of internal and external opinion and buffering of assumed habitat and does not take into account the site-specific suitable habitat."  Thus, the Biological Technical Report relies on focused surveys, which were conducted to determine the actual presence of special-status plant and wildlife species within the Project site.

7



The Draft EIR acknowledges that the proposed Project would result in a potentially significant adverse impact to the gnatcatcher, either directly or through the modification of sensitive gnatcatcher habitat.  But, it concludes that the potentially significant impacts "would be reduced to less than significant through the proposed project's on-site Habitat Preserve outlined in Mitigation Measure BIO-1, which would conserve 1,017.61 acres of suitable habitat containing 25 Use Areas (64% preserved); Mitigation Measure BIO-2, which would restore 45.54 acres of temporary impacts to suitable habitat areas; Mitigation Measure BIO-14 which would require preconstruction nesting bird surveys in suitable habitat; and through Mitigation Measure BIO-17, which would remove brown-headed cowbirds [an invasive species] from the project site."  (Fn. omitted.)

C. *Public Comments and the Final EIR*

The City made the Draft EIR available for public review and comment through publication and on the City's website, from May 29, 2020 until July 13, 2020.  In the final revised EIR, (Final EIR) published in August 2020, the City made changes based on the written comments, and provided both high-level summaries and individual responses to all written comments.

Beyond the individual responses, the Final EIR also includes thematic responses on specific environmental topics that were frequently commented on during the 45-day public review period.  The first thematic response addresses the gnatcatcher.[5]  It explains that the Project site includes USFWS-designated Critical Habitat for the gnatcatcher, but that such

---

[5]     The Final EIR also includes specific responses to individual comments, including a letter from the Center for Biological Diversity, dated July 13, 2020.

9

designations are not precise, and may include both suitable and non-suitable habitat. Accordingly, the Biological Resources Technical Report relied on focused surveys to define the suitable habitat and specific use areas that coastal California gnatcatcher pairs were "observed utilizing (i.e., nesting and/or foraging in)." Although some comments questioned the recency of these surveys, the Final EIR points out that the Biological Technical Report utilized data sets from both 2005 and 2016, providing a valuable baseline for the status of the species within the Project site.

The Final EIR also notes that the City received comments suggesting that off-site impacts to the gnatcatcher habitat were not adequately addressed. In response, the City updated the Biological Resources Technical Report to show the Critical Habitat within a 1-mile buffer around the Project site. In addition, the Final EIR states that "EIR Section 4.3.5, Project Impacts and Mitigation Measures, addresses both direct and indirect impacts to special-status wildlife species and to sensitive natural communities. Specifically, EIR Mitigation Measure BIO-1 (Preserve Management Plan) would provide in-perpetuity management of the Critical Habitat for coastal California gnatcatcher included in the Habitat Preserve and help assist in the conservation and recovery of this species. Furthermore, preconstruction surveys would be conducted prior to construction to ensure that direct impacts to this species would be avoided (see EIR Mitigation Measure BIO-14, Nesting Bird Survey). If the species is observed, restrictions would be implemented," and all clearing would occur outside the nesting period. Finally, Mitigation Measure BIO-6 would require "noise-reducing berms or walls that would be constructed adjacent to commercial areas and any other uses that may introduce noise that could affect or interfere with wildlife utilization of the Habitat Preserve." Thus, the Final EIR concludes, the

current mitigation measures "would also reduce impacts to the surrounding Critical Habitat areas to a less than significant level."

Finally, in response to another comment stating that the Draft EIR "fails to use the best available science to analyze the ecological impacts of removing and fragmenting USFWS-designated Critical Habitat for the coastal California gnatcatcher," the Final EIR explains that studies confirm "that an intact 900-acre habitat block [in the Preserve] would be large enough to sustain commonly occurring species in the coastal San Diego region, even if habitat connectivity to off-site habitat areas were severely constrained." The response also identifies two other sites with 500 and 600 acres of preserved habitat, respectively, "surrounded by dense urban landscapes," that each support 50 or more pairs of gnatcatchers. Moreover, the response points out that the "in-perpetuity and active management of the Habitat Preserve . . . would prevent degradation of the 900-acre habitat block from edge effects."

After addressing the public comments, the City maintained its previous finding that the proposed mitigation measures would reduce the impacts to the gnatcatcher and its habitat to less than significant. On September 23, 2020, the City voted to certify the Final EIR and approve the Project. The findings of fact supporting the resolution state that the "[i]mplementation of the proposed project would result in the direct loss of habitat, including foraging habitat, for the majority of the special-status wildlife species" discussed in the Final EIR, including the gnatcatcher. But "Mitigation Measures BIO-1, BIO-2, BIO-6 through BIO-8, and BIO-10 through BIO-20 would mitigate all direct and indirect permanent and temporary impacts to sensitive wildlife species to below a level of significance."

11

D. *The Petition for Writ of Mandate*

On October 21, 2020 Appellants filed a petition for a writ of mandate "under Code of Civil Procedure sections 1085 and/or 1094.5," asking the trial court to direct the City to vacate its approval of the Project and certification of the Final EIR. They asserted that the City Council's approval of the EIR violated CEQA because the EIR was deficient in multiple respects, including in its discussion of the Projects impacts to "numerous special status wildlife and plant species" and wildfire safety and evacuation plans.

After briefing and argument, the trial court found the Final EIR was inadequate in several respects and granted the petition. However, in the same ruling, the trial court concluded that substantial evidence supported the City's finding that the mitigation measures in the Final EIR adequately reduced the impacts to the gnatcatcher and the spadefoot toad, the two species that Appellants focused on in their arguments on the petition.

On March 25, 2022 the trial court entered judgment and a peremptory writ of mandate, ordering the City to set aside and vacate its approval of the Project. The trial court retained jurisdiction over the proceedings by way of a return to the peremptory writ of mandate, pending compliance with the terms of the writ.

Appellants filed a timely notice of appeal.

## II.    DISCUSSION

Although the trial court concluded there was adequate support for the City's findings of less than significant impacts to both the gnatcatcher and the spadefoot toad, Appellants focus their appeal solely on the impacts to the gnatcatcher. They assert that the on-site Preserve does not compensate for the approximately 400 acres of gnatcatcher habitat that will be destroyed; that the associated reclamation and restoration measures are not mandatory;

12

and that the remaining mitigation measures are likewise insufficient to avoid or reduce the impacts to the gnatcatcher and its habitat. The City and HomeFed maintain that the mitigation measures are adequate, and assert that Appellants are precluded from asserting the on-site Preserve is inadequate because they failed to exhaust their administrative remedies by neglecting to raise the issue during the public comment period.

A. *Relevant Legal Principles and Standard of Review*

As this court recently explained, "CEQA 'and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. "The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved." ' " (*Save Our Access v. City of San Diego* (2023) 92 Cal.App.5th 819, 842 (*Save Our Access*).)

Where, as here, the lead agency determines that a Project may have significant impacts on the environment, it must prepare and certify an EIR before approving the Project. (*Save Our Access*, *supra,* 92 Cal.App.5th at pp. 842-843.) " 'The basic purpose of an EIR is to "provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which

13

the significant effects of such a project might be minimized; and to indicate alternatives to such a project." ' " (*Id*. at p. 843.)

Consistent with these goals, the EIR must identify all significant environmental effects of the proposed project and must also identify feasible mitigation measures to minimize each of those effects. (§§ 21002.1, subd. (a), 21100, subd. (b)(1)(3); Guidelines § 15126.4, subd. (a)(1)). The lead agency, in this case the City, shall not approve the Project unless it makes one of several findings including, as relevant here, that "[c]hanges or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment." (§ 21081.) The finding must be supported by substantial evidence in the record. (§ 21081.5.)

When a lead agency's impact finding is challenged on appeal, we review the administrative record *de novo* to determine whether there is substantial evidence to support the finding. (*Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1545.) "[O]ur review of the administrative record for error is the same as the trial court's; we review the agency's action, not the trial court's decision." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 381.) And, thus, we are not bound by the trial court's conclusions. (*Ibid.*; *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 113-114.)

In conducting our own independent review for substantial evidence, we " ' "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.) Rather, we give " 'deference to the agency's substantive factual conclusions.' " (*Ibid*.) "[T]he burden is on the party

14

challenging the EIR to show it is inadequate." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626 (*Native Plant Society*).

B. *Respondents Waived Their Failure to Exhaust Argument*

Because it is potentially dispositive, we turn first to Respondents' contention that Appellants have waived their argument regarding the alleged insufficiency of the evidence supporting the City's findings as to the gnatcatcher by failing to specifically raise the issue during the public comment period, and thus, failing to exhaust their administrative remedies.

Before filing an action or proceeding under CEQA, at least one party must have presented the alleged grounds for noncompliance with CEQA either orally or in writing to the reviewing agency during the public comment period. (§ 21177, subds. (a), (b)). Although the exhaustion doctrine has been described as "jurisdictional," (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 589 ["the requirement of exhaustion is a jurisdictional prerequisite, not a matter of judicial discretion"]), in this context, it simply means that the alleged insufficiency must have been "presented to the public agency orally or in writing by any person during the public comment period." (§ 21177, subd. (a).)

Here, Respondents contend the "laundry list of concerns" that Appellants presented during the public comment period did not include a specific objection that offsite mitigation would be needed to offset the impacts to gnatcatchers. In response, Appellants assert that the trial court correctly concluded that they did raise the issue during the public comment period, and that the City has waived *its* ability to challenge that finding by failing to file its own appeal of the trial court's ruling. We agree. (See *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 587 (*Preserve Poway*) ["absent a

15

cross-appeal, Preserve cannot appeal from adverse determinations on fire safety and wetlands mitigation that involve different portions of the judgment from which appellants have appealed"]); *Transworld Sys. v. County of Sonoma* (2000) 78 Cal.App.4th 713, 716, fn. 4 (*Transworld*) [concluding the county waived its right to contest an adverse finding of the trial court by failing to file a cross-appeal]; see also *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665 [respondent who failed to file his own appeal seeking affirmative relief forfeits appellate challenge to trial court's ruling]).

As Appellants point out, the trial court specifically considered and ruled upon the exhaustion issue, noting that comments included in the Final EIR raised concerns that "the BIO-1 and BIO-2 measures would be inadequate to mitigate the impacts to gnatcatchers and gnatcatcher habitat, and that the D[raft] EIR does not adequately mitigate impacts to the coastal gnatcatchers and their critical habitat." Thus, the trial court concluded that "[t]he record reflects petitioners and others gave notice regarding the gnatcatcher mitigation measures issue at the administrative level." Yet the City did not file a notice of appeal or cross-appeal. Accordingly, the exhaustion argument is not properly before us. (See *Preserve Poway, supra,* 245 Cal.App.4th at p. 587; *Transworld, supra,* 78 Cal.App.4th at p. 716, fn. 4.)

Regardless, even if the City had appealed the trial court's ruling on this issue, we would reach the same result. As noted, Appellants did raise their concerns regarding the adequacy of BIO-1 and BIO-2 to address the impacts to the gnatcatcher and its habitat. Indeed, in response to the comments, the City asserted the 900-acre Preserve, like other similar preserves, would be sufficient to maintain the existing gnatcatchers in the area.

16

Respondents focus on Appellants' failure to propose a specific solution to the issue, i.e., offsite mitigation, but they cite no authority for the proposition that beyond raising specific concerns to the reviewing agency, a party must also state a specific solution for each concern to comply with CEQA's exhaustion requirements. (See, e.g., *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750 [Plaintiffs' objections to project "fairly apprised" the agency of impacts on surrounding community, even if they did not "identif[y] the precise legal inadequacy" relied upon by the trial court]; *Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1105 (*Save the Hill*) [exhaustion requirement does not bar an objection that fairly apprises the agency of the purported defect]; *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 685 [comments "fairly apprised" City of petitioners' concerns].)

Accordingly, we decline to resolve the matter based on the alleged failure to exhaust administrative remedies and will instead reach the merits of Appellants' arguments.

C. *Substantial Evidence Supports the City's Findings Regarding the Coastal California Gnatcatcher*

As noted, the proposed development would destroy approximately 400 acres of gnatcatcher habitat, and would therefore have potentially significant environmental effects on the gnatcatchers. The City does not dispute this. But the City found that the EIR's proposed mitigation measures—including the creation of a more than 1,000-acre Preserve to be managed and maintained in perpetuity—are sufficient to reduce the impact on gnatcatchers to a "less than significant" level. The trial court concluded that substantial evidence supported that determination. Appellants dispute the sufficiency of the evidence supporting the City's finding and assert that the

17

proposed mitigation measures merely "preserve what's left," and do nothing to off-set the destruction of a significant amount of gnatcatcher habitat.

According to the EIR, the Project objectives include, *inter alia*, goals to: "[c]reate a new community with clustered development that provides residential, commercial, mixed-use, agricultural, and recreation land uses while preserving large blocks of significant natural open space areas as a habitat preserve"; to address the state's housing crisis; and to provide for recreation. The EIR notes that without the Project, the "project site would remain in its existing undeveloped condition without open space management." Currently, the area "includes a network of private dirt roads and trails, many of which are subject to frequent illegal off-road vehicular traffic and unauthorized human activities that have been detrimental to the sensitive habitats" in the area. Under the Project, a significant portion of that land, including a large number of gnatcatcher use sites, would be preserved in perpetuity.

The Project EIR summarized the proposed mitigation measures that would reduce the significant impacts on gnatcatchers to below a level of significance as follows:

> "Potentially significant impacts to coastal California gnatcatcher would be reduced to less than significant through the proposed project's on-site Habitat Preserve outlined in Mitigation Measure BIO-1, which would conserve 1,017.61 acres of suitable habitat containing 25 Use Areas (64% preserved); Mitigation Measure BIO-2, which would restore 45.54 acres of temporary impacts to suitable habitat areas; Mitigation Measure BIO-14 which would require preconstruction nesting bird surveys in suitable habitat; and through Mitigation Measure BIO-17, which would remove brown-headed cowbirds from the project site."

The establishment of this on-site Preserve, set forth in Mitigation Measure BIO-1, is the heart of the EIR's mitigation measures for the gnatcatchers and their habitat. The measure contemplates setting aside

18

various portion of the Project site, including 1,018 acres of coastal scrub habitat;[6] recording a conservation easement for such portions; and then managing them with a Preserve Management Plan (PMP).  The proposed Preserve "would include areas undisturbed from planned development and specific revegetated slopes at the edge of the planned development area. Revegetated slopes would consist of native materials planted to blend back into the existing natural landscape in conformance with a habitat restoration plan."

Appellants argue that Mitigation Measure Bio-1 simply maintains the status quo as to such parcels and does nothing to compensate for the permanent loss of gnatcatcher habitat in the remaining portions of the Project site.  To the contrary, in our view, the measure replaces unmanaged open land with a permanently protected Preserve that will be funded and maintained in perpetuity.

According to the EIR, the Preserve would be protected by the recording of a conservation easement, and "would be owned, conserved, and managed in perpetuity by a Habitat Preserve management entity through the PMP with a funding mechanism approved by the City in accordance with applicable regulations."   "The PMP would direct long-term management of preserved biological resources through the enhancement, restoration, and maintenance of native vegetation communities, sensitive species, and the local ecosystem." Specifically, the management objectives would include, among others, "[r]estor[ation] and enhanc[ement] of native plant and animal communities in

---

6    According to the Project's EIR, the Fanita Ranch site includes an estimated 1,471 acres of suitable habitat for the gnatcatcher—an area roughly co-extensive with the site's total coastal sage scrub habitat.

key locations to support long-term propagation of viable populations of sensitive plant and animal species," and the development of "a management strategy to enhance and protect sensitive species, habitats, and wildlife corridors and linkages to ensure they remain functional and healthy." Moreover, the majority of the Preserve would be located in the southern portion of the project site, coinciding with numerous gnatcatcher use sites, as shown on the maps reproduced *ante* in section I.B.

Conservations easements like the one that will be used to protect the Preserve established by Mitigation Measure Bio-1 have been accepted as a form of mitigation for damage caused to existing habitats for some time. Much like the proposal at issue here, the EIR in *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, proposed mitigation for lost gnatcatcher habitat by "on-site or off-site preservation of similar habitat at a ratio of at least two to one." (*Id*. at p. 794.) And, in *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, the court found a conservation plan that required "the purchase of a half-acre for habitat reserves for every acre of development," along with additional measures, like preconstruction surveys and avoidance of development in a critical "one-mile hawk zone," to be adequate to support certification of the EIR, despite the less than 1:1 ratio. (*Id*. at pp. 1038–1039; see also, *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 528 (*Save Panoche Valley*) [finding "sufficient evidence in the record that conservation of habitats through easements and other methods would mitigate the impact on the biological resources to a less than significant effect"]; *Native Plant Society, supra,* 172 Cal.App.4th at p. 610 [finding mitigation measures that "would require the applicant to preserve two acres of existing habitat or create one acre of new habitat for each acre of habitat

impacted by the Project" supported a finding of less than significant impacts].)

In *Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230 (*Masonite*), the court addressed a proposed agricultural conservation easement (ACE) and relied on many of these same cases to conclude, "[t]here is no good reason to distinguish the use of offsite ACEs to mitigate the loss of agricultural lands from the offsite preservation of habitats for endangered species, *an accepted means of mitigating impacts on biological resources*." (*Id.* at pp. 238–239, italics added.) The court in *Masonite* also pointed out that Guideline section 15370, subdivision (e), expressly recognized the acquisition or enhancement of substitute environments as a form of mitigation. (*Masonite*, at p. 239.)

Thereafter, in 2018, the California Natural Resources Agency proposed an amendment to Guideline section 15370, subdivision (e) to explicitly refer to conservation easements as a potential form of mitigation. (2018 Cal. Reg. No. 52 (Dec. 28, 2018), pp. 714.26–714.27.) The amendment also included a reference to *Masonite* as support. (*Ibid.*) The full text of Guideline section 15370, subdivision (e) now specifies that the term " 'Mitigation' includes" measures that "[c]ompensat[e] for the impact by replacing or providing substitute resources or environments, <u>including through permanent protection of such resources in the form of conservation easements</u>." (Guidelines § 15370, subd. (e), amended language underscored.)

Despite this history, Appellants argue that this approach was rejected in *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814 (*King*). The project at issue in *King* was expansive, encompassing 3,700 square miles and resulting "in the conversion of 298 acres of agricultural land annually" from 2015 to 2040, for a total loss of approximately 7,450 acres of

21

agricultural land. (*Id.* at p. 870.) The EIR recognized that the project would have a significant impact on agricultural land, but described mitigation measures, including use of agricultural conservation easements, and concluded that the " '[i]mpacts would be less than significant with mitigation.' " (*Id.* at p. 871.) More specifically, the EIR provided a measure to " '[f]und[] and/or purchas[e] agricultural conservation easements . . . to be managed and maintained by an appropriate entity.' " (*Ibid.*) The court found that this provision did not provide effective mitigation. It reasoned:

> "Entering into a binding agricultural conservation easement does not create new agricultural land to replace the agricultural land being converted to other uses. Instead, an agricultural conservation easement merely prevents the future conversion of the agricultural land subject to the easement. Because the easement does not offset the loss of agricultural land (in whole or in part), the easement does not reduce a project's impact on agricultural land. [It] would not change the net effect of the annual conversions. At the end of each year, there would be 289 fewer acres of agricultural land in Kern County."

(*King*, *supra*, 45 Cal.App.5th at pp. 875–876).

Appellants assert that, here, there is nothing in the record here to show that preserving a portion of the total Project land would offset the significant gnatcatcher impacts on the developed portions, and thus, "like the permanent loss of agricultural lands in [*King*], these impacts would remain significant after implementation of the conservation easement."

22

The City disagrees with Appellants' reliance on *King*.[7]  It relies on *Save the Hill, supra,* 76 Cal.App.5th 1092, another recent case in which the court found the use of a conservation easement *was* sufficient to mitigate for lost habitat.  In *Save the Hill*, the EIR proposed the acquisition of 85 acres of an off-site property, then designated as a protected space in the city's general plan, to offset the project's permanent loss of 31.78 acres of habitat for various protected animal species.  (*Id*. at 1116.)  The plaintiffs there argued that just as in *King*, the land subject to the easement was already protected, so it could not be considered an offset for the loss of the project land.  The appellate court disagreed and stated:

> "We do not find *King* . . . helpful in this case.  CEQA does not require mitigation measures that completely eliminate the environmental impacts of a project.  Rather, CEQA permits mitigation measures that would substantially lessen the significant environmental effects of the project.  (§ 21002.)"

(*Save the Hill*, at p. 1117.)

We agree.  In addition, we note that the court in *King* did not consider the CEQA Guidelines' 2018 amendment, which specifically provides for the use of easements as a mitigation measure, likely because the EIR before the *King* court pre-dated the amendment.  (See Practice Under the California Environmental Quality Act §13.72 (CEB)).  The *King* court did acknowledge

---

7    The City first notes that unlike *King*, the Project at issue here does not involve the conversion of agricultural land, but it does involve the conversion of land in the form of habitat.  We do not find this argument to be helpful.  (See, e.g., *Masonite, supra*, 218 Cal.App.4th at pp. 238-239 (*Masonite*) "[t]here is no good reason to distinguish the use of offsite [agricultural conservation easements] to mitigate the loss of agricultural lands from the offsite preservation of habitats for endangered species"].)

23

the *Masonite* decision in a footnote, but stated simply that it was not in conflict because the court in *Masonite* "did not consider the net effect of implementing an agricultural conservation easement and whether a significant impact could be reduced to a less than significant level by such an easement. [Rather], the court concluded, '[T]he EIR's determination that [ACEs] are legally infeasible cannot be sustained' and remanded for further environmental review." (*King, supra*, 45 Cal.App.5th at p. 876, fn. 32.)

As noted, the court in *Masonite* expressly found that conservation easements were "an accepted means of mitigating impacts on biological resources," and the California Natural Resources Agency relied on *Masonite* in amending Guideline section 15370, subdivision (e). (See *Masonite, supra,* 218 Cal.App.4th at p. 239; 2018 Cal. Reg. No. 52 (Dec. 28, 2018), pp. 714.26–714.27.) Considering the discussion in *Masonite*, as well as the cases cited therein, and the subsequent amendment to Guideline section 15370, subdivision (e), we find the analysis in *Save the Hill* persuasive and likewise decline to follow *King*.

To construe CEQA as requiring a complete offset or compensation for any loss of habitat would have the practical effect of limiting the use of conservation easements to only those situations in which the land identified as a potential easement would need to be converted into the type of land sought to be conserved (e.g. raw land would need to be converted into farmland or into coastal sage) so that it could entirely offset the loss of such land in the project. The language of Guideline section 15370, subdivision (e) does not support such a construction, nor do any of the cases cited by the Appellant. Rather, we agree that CEQA does not required a *complete* offset for lost habitat, and that conservation easements can *mitigate* such loses by substantially *lessening* the impacts to a particular species' habitat. (See

24

Guideline § 15091 [permitting an agency to certify an EIR if mitigation measures "avoid *or substantially lessen* the significant environmental effect as identified" (italics added)].)

This is particularly true where, as here, the area to be conserved has been surveyed and identified as containing numerous areas utilized by the impacted species, the gnatcatcher, and the City has provided examples of other similar habitat preserves that support a greater number of gnatcatcher pairs than observed in the impacted area. The protection and preservation of land that is "specifically identified as an area of high habitat value" is one way in which to reduce the impact of habitat loss to a specific protected species. (See *Save Panoche Valley, supra,* 217 Cal.App.4th at p. 527 [" '[M]itigation need not account for every square foot of impacted habitat to be adequate. What matters is that the unmitigated impact is no longer significant.' "].) (*Id.* at p. 528.)

In their reply brief, Appellants concede that conservation easements can indeed be used as mitigation, but argue that the easement here is insufficient mitigation where it fails to offset or compensate for the permanent loss of 400 acres of habitat. But Appellants do not provide any explanation of what else would need to occur for the Preserve to sufficiently "offset" the permanent loss of habitat. The very nature of a conservation easement is that the loss of habitat in one area is compensated for by permanently preserving habitat in another. And here, as noted, the remaining habitat would not just be preserved, it would be managed in perpetuity, with the goals of restoration and revegetation. In other words, if, as Appellants assert, the current proposal is not sufficient to offset or compensate for the region of habitat that will be lost, they do not explain

what *would* be needed for a conservation easement to be sufficient to compensate for an acknowledged loss of habitat on the Project site.

To the extent Appellants are relying on the distinction between on-site preservation and off-site preservation, we do not find that distinction particularly helpful.  If the contemplated conservation easement would be adequate mitigation only if it were outside the project site, then HomeFed could have simply drawn the project lines to exclude the contemplated Preserve, thereby rendering it an off-site resource whose acquisition would be the basis for an acceptable off-site conservation easement.  Indeed, in *Save the Hill,* the court acknowledged that the preserved area "can be on the same site if the site has sufficient space," and that the actual proposed preserve area at issue there was a "hydrologically connected" area just downstream from the project site.  (*Save the Hill, supra,* 76 Cal.App.5th at pp. 1100, 1115–1116.)  The fact that the Preserve proposed in Mitigation Measure Bio-1 here is included within the Project boundaries does not detract from its potential efficacy under CEQA.

Appellants also assert that the PMP does not *require* restoration or enhancement, and that the remaining mitigation measures likewise do nothing to reduce the impact of lost gnatcatcher habitat.  We are not persuaded.  Appellants point out isolated instances of discretionary language in the PMP, but fail to credit the provisions of the PMP that define its guiding objectives to include enhancing and restoring available habitat, a

critical element in the effectiveness of the proposed Preserve.[8]  Likewise, Appellants concede that Mitigation Measure Bio-14 aids in the preservation of the remaining habitat by providing a mechanism to remove another invasive species, the brown cowbird, but fail to acknowledge that doing so actually improves upon the status quo.

Finally, Appellants also acknowledge that Mitigation Measure Bio-2 requires the restoration of approximately 45 acres of habitat that will be temporarily disturbed by the construction, but likewise assert, rather summarily, that this will not compensate for the 400 acres that is lost. Again, they provide no authority for the proposition that the loss must be entirely offset.  The various mitigation measures, taken together, act to minimize the loss of habitat while also enhancing, restoring, and maintaining the habitat that remains, in perpetuity.  We agree with the trial court's analysis that the management plan sufficiently contemplates the increase of available habitat through enhancement and restoration efforts, which thereby mitigates the potential impacts to the coastal California gnatcatcher.

For these reasons, we conclude that substantial evidence supports the City's approval of the gnatcatcher mitigation measures.  Accordingly, we affirm the judgment of the trial court.

---

[8]     For the same reasons, we reject Appellants' assertion, in passing, that the EIR improperly defers mitigation.  Moreover, as Respondents point out, this assertion was not raised in the trial court, and, further, the argument is not developed on appeal.  (See, e.g., *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 ["We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt' "].)

## III.   DISPOSITION

The judgment is affirmed.  Respondents are entitled to costs on appeal.

KELETY, J.

WE CONCUR:


O'ROURKE, Acting P.J.


DO, J.